William S. FRENCH,
Plaintiff-Respondent,

v.

TRI–CONTINENTAL LEASING
COMPANY, a corporation,
Defendant-Appellant.

No. 9865.

Missouri Court of Appeals,
Springfield District.

Nov. 16, 1976.

Motion for Rehearing or Transfer
Denied Dec. 6, 1976.

Application to Transfer Denied
Feb. 14, 1977.

Theo C. Salveter, IV, Walker, Salveter & Stoner, Springfield, for defendant-appellant.

William A. Wear, William A. Wear, Jr., Wear & Wear, Springfield, for plaintiff-respondent.

Before STONE, P. J., and HOGAN and TITUS, JJ.

PER CURIAM.

This bench-tried action arose out of a contract to lease a dairy herd. Plaintiff has had judgment in the amount of $2,809.50 plus interest and the defendant appeals.

The record is very diffuse, but from an examination of all the evidence, including the exhibits, we glean the following: At some time in the fall of 1972 defendant's Springfield, Missouri, branch manager "want[ed] to do business" with the plaintiff. Gleason, the branch manager, called on the plaintiff, and the two discussed the proposed deal "for better than a month". According to Gleason, he and plaintiff agreed on the "basic terms" of the cattle lease in November 1972. Gleason "filled the blanks in" on a printed lease agreement, so plaintiff could read the agreement. Plaintiff's testimony was that this agreement "wasn't specific or anything because I hadn't bought any cattle at that point." In January 1973, apparently on January 17, a printed lease form was typed, plaintiff signed the agreement (lease), a financing statement (referred to as a "UCC–1"), and made a down payment of $2,809.50. At some time between November and January, Gleason had taken plaintiff to meet Lightner, a cattle dealer, and had told Lightner that plaintiff had "been approved by [defendant] and [plaintiff] would like to see some cattle." Gleason further testified that "they [plaintiff and Lightner] came to agreements and terms on their own at that point. In other words, Mr. French had the right to bargain for the price and so on for the cattle, which he did." Plaintiff's testimony was, in substance, that he had dealt with Lightner before, that he had been considering buying "one of the exotic breeds that were being bred to a Holstein", and that when he and defendant decided to deal Gleason took him to see Lightner because Gleason knew plaintiff and Lightner had had conversation about the exotic cattle. In any event, plaintiff located the cattle— 50 head—he intended to lease, and Lightner, the seller, called plaintiff "about the end of the first week of January, '73", asking if plaintiff "would take" the cattle. It was Gleason's recollection, and certain exhibits indicate, as we have just noted, that the initial transaction was completed January 17, 1973. In drafting the proposed lease, however, Gleason had forgotten to note that F & S Construction Co., a nominal lessee, was a corporation. The lease of January 17 was returned to Springfield by

defendant's St. Louis office. Gleason's omission was corrected, plaintiff signed the corrected lease, and it was sent forward to St. Louis. Although, again, the chronology of the case is difficult to follow, it is inferable that by February 1, 1973, the initial phase of the parties' dealing was complete. As defendant's exhibit "H" shows, Gleason wrote defendant's vice president, advising the vice president (we paraphrase) that he enclosed a lease contract, "health papers", invoices from the seller, a "UCC–1", a milk assignment, and a "Schedule A". Gleason advised the defendant that plaintiff would insure through "his own company making loss payable to Tri-Continental Leasing Company." Gleason requested that "the funding check" in the amount of $26,750 be sent to him; he would deliver the check to Lightner and "have him sign his invoice paid." The letter of February 1 bears a postscript informing defendant that, "The UCC's may be filed immediately . . . . I will sign and submit the milk assignment to Mid-Am and send a signed copy to your attention later this week."

A hitch promptly developed. Gleason's testimony was that in February, after the first lease was signed, it was discovered that the lease contained "a provision for purchase option . . . which needed to be removed, at Mr. French's request, and the lease agreement was redrawn, taken to the printer's and printed, and then sent back to me." Gleason testified that "the same documents with a few small changes" were returned by defendant's St. Louis office in "two to three weeks" and plaintiff again signed. The first lease was not offered in evidence, so we cannot know what the legal effect of the so-called "purchase option" was. However that may be, Gleason testified that after the second lease was executed, a "corporate leasing resolution" was sent to him "to have [plaintiff] sign." During the interval between the execution of the second lease and Gleason's receipt of the "corporate resolution", whatever it was, Lightner had called Gleason several times asking for payment. Plaintiff's testimony was that after he signed the second lease and before he was asked to execute the

"corporate resolution", Lightner called "three or four times" asking for payment. Plaintiff told Lightner he, plaintiff, was doing everything he could do to get the money.

Upon being asked to sign the "corporate resolution", plaintiff refused, and told Gleason that he wanted, in Gleason's words, "to cancel the lease at that point and get his check for the front money." Gleason called defendant's St. Louis office and advised that office that plaintiff refused to execute the "corporate resolution" and was going to "cancel" the lease. The defendant retained plaintiff's deposit, and this action followed.

At the outset, we must deal with plaintiff's contentions that the appeal should be dismissed 1) because the statement of facts in defendant's brief contains assertions which are misleading, untrue and argumentative, in violation of Rule 84.04(c), V.A.M.R., and 2) because defendant's "points relied on" are merely abstract statements of law which do not show how they are related to any action or ruling of the trial court, and in addition, no authority is cited to points I, IV, and V.

 The defendant's brief is seriously deficient. As for the argument that defendant has misrepresented the facts, we agree that its statement is conclusional and argumentative, but it does not appear that counsel has deliberately undertaken to distort or misrepresent the facts, and we decline to dismiss the appeal on that ground. However, plaintiff's assertion that assignments of error to which no authority is cited must be considered abandoned is well-taken, and because no semblance of authority, foreign or domestic, is cited to defendant's points I, IV, and V, we consider those points to be abandoned. *State v. Schulten*, 529 S.W.2d 432, 434[6] (Mo.App.1975); *Cady v. Kansas City Southern Ry. Co.*, 512 S.W.2d 882, 885–886[7] (Mo.App.1974); *Sierk v. Reynolds*, 484 S.W.2d 675, 682[7] (Mo.App.1972). And, we again find ourselves in the position of not knowing, precisely, why the trial court decided the issues as it did. No findings of fact nor conclu-

sions of law were requested or tendered by the parties, and therefore defendant is in no position to assert that any specific or implied finding constitutes error. *Pallardy v. Link's Landing, Inc.*, 536 S.W.2d 512, 515[1] (Mo.App.1976); *Swetnam v. U. S. By-Products Corp.*, 510 S.W.2d 829, 830[1] (Mo.App. 1974). Further, as this court noted in *Pallardy*, supra, 536 S.W.2d at 515[2], the trial court's judgment is presumptively correct, and the defendant has the burden to demonstrate that the judgment is erroneous. *Massman Construction Co. v. Kansas City*, 487 S.W.2d 470, 487[6] (Mo.1972); *Weston v. Great Central Ins. Co.*, 514 S.W.2d 17, 21[3] (Mo.App.1974).

To meet this burden, we have before us two assignments of error: 1) that signing of the lease by the defendant was not a condition of the agreement between the parties; 2) that the court erred in finding that the cow lease was not signed by the defendant because under the Statute of Frauds, defendant's signature was not required because defendant was not the party to be charged. These two points may be quite well-taken, but there is no record indication that the trial court based its decision on the requirements of the Statute of Frauds, § 432.010, RSMo 1969, V.A.M.S., or that defendant's signature, or the lack of it, was a factor in the trial court's decision that plaintiff was entitled to recover.

The court would be justified in dismissing this appeal because of the inadequacies of the defendant's brief. In a bench-tried action the appellate court reviews the whole record, determines the weight and value of the evidence and whether the evidence is sufficient under Rule 73.01(3), V.A.M.R., as construed in *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo.banc 1976). Nevertheless, as pointed out long ago in *Schlanger v. Simon*, 339 S.W.2d 825, 828 (Mo.1960), we perform our appellate function:

> "only in respect to the specific matters urged by [the] appellant as constituting error. [The court] does not review the whole case on its own initiative to determine what result it would have reached if

it were sitting as the trial judge. . . An appellate court should not become an advocate for one of the parties, and therefore it is not the duty of an appellate court to search the evidence in an effort to find some theory, and facts in support thereof, to establish a general assertion that the trial court reached the wrong result."

As we have noted, the trial court's findings are voluntary, not subject to specific assignment of error as if they had been requested. Only two of five assignments of error are accompanied by citations of authority; neither is demonstrably relevant to the trial court's decision. We will not become advocates for either party and develop a rationale for the trial court's finding or a basis for reversal. The judgment is affirmed.

All concur.